Jason B. Lattimore
**The Law Office of**
**JASON B. LATTIMORE, ESQ. LLC**
55 Madison Avenue, Suite 400
Morristown, NJ 07960
Telephone: (973) 998-7477
Facsimile:  (973) 264-1159
Jason@LattimoreLaw.com

*Attorney for Plaintiff,*
*Interlink Products International, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| INTERLINK PRODUCTS INTERNATIONAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> WADE CROWFOOT, DREW BOHAN, MELISSA RAE KING, and LEA HARO, <br><br> Defendants. | Case No: 2:20-cv-7654 <br><br><br> **COMPLAINT** |

Plaintiff, Interlink Products International, Inc. (hereinafter "Interlink"), by and through its undersigned attorney, hereby complains of Defendants, Wade Crowfoot, Drew Bohan, Melissa Rae King and Lea Haro (together, "Defendants"), each in their respective official capacities, as follows:

### THE PARTIES

1. Interlink is a New Jersey corporation with its principal place of business at 1315 East Elizabeth Avenue, Linden, New Jersey 07036. All of Interlink's offices and business facilities are located in New Jersey.

2. On information and belief, Wade Crowfoot is the California Secretary for Natural Resources and the head of the California Natural Resources Agency, the California state agency with authority over the California Energy Resources Conservation and Development Commission a/k/a the California Energy Commission ("CEC").  On information and belief, Wade Crowfoot is a California resident with his principle business address at 1416 Ninth Street, Suite 1311, Sacramento, California 95814.  Mr. Crowfoot is the highest ranking official at the California Natural Resources Agency and directs the activities of the CEC and its representatives.  At all relevant times, Wade Crowfoot participated in, directed, caused and/or was responsible for the acts and practices of the CEC that are the subject of this Complaint.

3. On information and belief, Drew Bohan is the Executive Director of the CEC.  On information and belief, Drew Bohan is a California resident with his principle business address at 1516 Ninth Street, Sacramento, California 95814.  Mr. Bohan is the highest ranking official within the CEC and directs the official activities of the CEC and its representatives.  At all relevant times, Drew Bohan participated in, directed, caused and/or was responsible for the acts and practices of the CEC that are the subject of this Complaint.

4. On information and belief, Melissa Rae King is the Assistant Executive Director for Compliance Assistance and Enforcement at the CEC.  On information and belief, Ms. King is a California resident with her principle business address at 1516 Ninth Street, Sacramento, California 95814. Ms. King is the highest ranking official within the Office of Compliance Assistance and Enforcement of the CEC. At all relevant times, Melissa Rae King participated in, directed, caused and/or was responsible for the acts and practices of the CEC that are the subject of this Complaint.

5.	On information and belief, Lea Haro is the Supervisor of the Office of Compliance Assistance and Enforcement of the CEC.  On information and belief, Lea Haro is a California resident with her principle business address at 1516 Ninth Street, Sacramento, California 95814.  At all relevant times, Lea Haro participated in, directed, caused and/or was responsible for the acts and practices of the CEC that are the subject of this Complaint.

## NATURE OF THE CASE

6.	This case arises out of Defendants' attempts to enforce California state regulatory requirements concerning showerheads against a New Jersey showerhead seller that does not sell or offer for sale the pertinent showerheads in California.  The CEC has adopted regulations imposing maximum water flow rate restrictions on showerheads, along with other regulatory requirements applicable to showerheads and certain other appliances (codified under 20 California Code of Regulations ("CCR") §§ 1601-1609).  By its express terms, the regulations in question apply to showerheads only "if they are sold or offered for sale in California."

7.	 Despite the express limitation of the regulations at issue, Defendants, under color of law and in their official capacity, have begun enforcing the regulations with respect to sales of showerheads (and, on information and belief, other appliances) that take place entirely outside of California.  Specifically, Defendants have targeted Interlink's internet sales, taking the position that their authority under the regulations extends to items sold out-of-state and shipped by common carrier to California.  Defendants ignore the well-settled rule, codified under the Uniform Commercial Code as adopted in both California and New Jersey, that telephone, mail order and internet sales that are delivered to customers by common carrier take place at the location where the goods are transferred to the common carrier.  In Interlink's case, its products that are pertinent to this lawsuit ship from New Jersey or locations other than California, and Interlink does not offer

to make sales of those showerheads in California. Thus, it does not sell or offer for sale the showerheads at issue in California.

8. Defendants' extraterritorial enforcement of the regulations violate both the Due Process Clause and Commerce Clause of the United States Constitution.

9. Defendants' actions violate the Due Process Clause because they are inconsistent with the stated scope of the regulatory scheme they seek to enforce, and the targets of their enforcement efforts are provided no notice by the regulations that they apply to out-of-state internet sales.

10. In their communications with Interlink, Defendants expressed their position that the regulations apply to showerheads shipped to California after sale in a different state. Defendants' shipping-to-California concept appears nowhere in the regulations or the statutory provisions authorizing the regulations. It is something Defendants created independently to expand the scope of their enforcement efforts under statutory and regulatory schemes at issue without going through the proper regulatory and rulemaking processes. This *ad hoc* enforcement further reflects Defendants' violation of the Due Process Clause.

11. Additionally, to accept Defendants' position that the regulations can be read to encompass goods shipped to California but sold elsewhere would also require the conclusion that the regulations are unconstitutionally vague in scope, due to the fact that they contain no language regarding shipping and contain language contradicting Defendants' position.

12. Defendants' enforcement efforts also violate the Dormant Commerce Clause. Defendants seek to regulate conduct – the sale or offer to sell showerheads (and other products) – occurring entirely outside the state of California. In doing so, Defendants place an undue burden on Interstate Commerce. Defendants further seek to unduly burden interstate commerce by

extraterritorially imposing regulations that could lead to inconsistent standards and undue burden of compliance on internet businesses. Under Defendants' approach, regulators from all fifty states could impose conflicting compliance standards pertaining to the physical construction and labeling of showerheads and other appliances that would be onerous or potentially impossible to comply with simultaneously.

13. Additionally, Defendants have threatened to avail themselves of the self-help remedy of contacting online sales platforms, such as HomeDepot.com., to request that Interlink's products be removed under the false premise that they violate the regulations at issue. Such conduct, which would circumvent the judicial process and impact Interlink's business far outside the context of any purported interest on the part of California, would constitute a further violation of Interlink's due process rights.

14. Defendants have been informed of their unconstitutional conduct, yet refuse to cease their enforcement efforts against Interlink.

15. Interlink asserts claims for declaratory and injunctive relief under 42 U.S.C. § 1983 and the United States Constitution, along with an award of statutory attorneys' fees pursuant to 42 U.S.C. § 1988.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over the claims pursuant to 28 U.S.C. §§ 1331 and 1343(3).

17. This Court has specific jurisdiction over Defendants because Defendants are attempting to enforce the regulations in question in this District against Interlink, a company residing and doing business in this District, with respect to sales of products in this District. Defendants also threaten to interfere with sales of Interlink's products in this District. Defendants

have therefore purposely directed their activities giving rise to Interlink's claims to this District, the impact of their conduct is felt in this District, and Defendants have indicated their intent to continue their unconstitutional and otherwise unlawful conduct in this District.

18. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## FACTS

19. Interlink is a New Jersey based company specializing in the development, production and marketing of innovative shower and bath products. The company was founded in 1996.

20. Interlink's products include several lines of showerheads that can be purchased from various sources, including online.

21. Products purchased from Interlink online are shipped by common carrier from Interlink's warehouse located in Linden, New Jersey.

22. Some of Interlink's products also ship from Amazon.com warehouses located in various states.

23. None of the showerheads at issue in this case ship from within California.

24. All shipping of Interlink's products sold online is handled through third-party shipping services (*i.e.*, common carriers).

25. When a customer purchases an Interlink showerhead online, the customer inputs the shipping address, which determines where the product will be shipped.

26. The Energy Policy and Conservation Act (42 U.S.C. §§ 6291-6309) ("the EP Act") is the federal statutory scheme that governs labeling, testing, registration and efficiency standards applicable to showerheads and other appliances. The United States Department of Energy is the agency charged with promulgating and enforcing regulations implementing the EP Act.

27. The EP Act and associated regulations provide, among other things, that the maximum permissible showerhead water flow rate is 2.5 gallons per minute ("gpm") at 80 psi of water pressure. The EP Act further requires that showerheads be labeled with the flow rate, along with other information, and that showerhead manufacturers publicly certify the compliance of their products with the flow rate standard. In connection with the certification requirements, manufacturers are required to list their compliance information in a public database.

28. The EP Act and associated regulations apply to showerheads sold anywhere in the United States.

29. California, through the CEC, has also enacted showerhead efficiency standards for showerheads (and other appliances) sold or offered for sale in that state. Those efficiency standards were adopted pursuant to Section 25402(c) of the Warren-Alquist Act (Cal. Pub. Resources Code, §§ 25000- 25968).

30. California's appliance efficiency regulations are located in Title 20, Division 2, Article 4 of the California Code of Regulations (20 CCR §§ 1601-1609) (hereinafter, "Article 4").

31. Article 4 contains regulatory efficiency standards, labeling requirements and compliance certification requirements for twenty-four categories of appliances including refrigeration products, air conditioners, various types of heaters, plumbing fixtures, plumbing fittings, lamps, dishwashers, clothes washers, clothes dryers, electric motors, computers, and battery chargers.

32. With respect to showerheads, specifically, Article 4 limits maximum showerhead flow rate to 1.8 gpm at 80 psi of water pressure and imposes labeling and compliance certification requirements. Article 4 also provides the Executive Director of the CEC (defined in Article 4 to include the Executive Director and his/her designees) with enforcement authority, which includes

the issuance of notices of violations, institution of administrative proceedings to impose civil penalties for violations of the regulations, and negotiating settlements with parties accused of regulatory violations.

33. Defendants Melissa Rae King and Lea Haro, along with the representatives of the CEC's Office of Compliance Assistance and Enforcement are among Executive Director Drew Bohan's designees with respect to enforcement authority under Article 4.

34. On or about February 26, 2020, Interlink received a letter from the CEC (signed by Defendant Lea Haro) notifying it of purported "violations of California's Appliance Efficiency Regulations" with respect to the sale of two showerheads: Interlink's Hydroluxe brand showerhead model 1433 and AquaDance brand showerhead model 4328 ORB. A copy of the letter is attached as Exhibit A.

35. The CEC's February 20, 2020 letter to Interlink reflects that someone acting on behalf of the CEC ordered the Hydroluxe1433 showerhead from Amazon.com on October 3, 2019 and the AquaDance 4328 ORB from HomeDepot.com on October 2, 2019, and caused the products to be shipped to an address in Carmichael California. The letter further indicates that the CEC had each of the two products tested and, although they complied with federal standards, they did not meet California's flow rate, labeling and product registration requirements set forth in Article 4.

36. The CEC's February 20, 2020 letter further alleges that (a) over fifty additional Hydroluxe and Aquadance brand showerheads are subject to Article 4, yet do not comply with California's labeling and compliance certification requirements; and (b) Interlink's AquaPalm, AquaSpa, AquaStar, DreamSpa, EcoSpa, HotelSpa, HydroJet, MegaRain, NutraFlo, PowerSpa, RainSpa, Razor, SpaStation, SpiralFlo, TotalSpa, and Fusion products are subject to Article 4, but do not appear in the CEC's compliance certification database.

37. Notably, Interlink's AquaPalm products are not showerheads. They are body scrubbers and brushes that do not even use water. Yet, they are included in the CEC's letter as falling within the scope of Article 4.

38. The letter demands, among other things, that Interlink cease and desist from selling "in California" any showerheads that violate Article 4 and provide an accounting of the number of showerheads Interlink has sold in California from July 1, 2015 to the present.

39. Interlink initially thought the CEC's letter was sent to it in error, because Interlink does not sell or offer for sale the showerheads at issue in the state of California.

40. Section 1601 of Article 4 (20 CCR § 1601), entitled "Scope," states that Article 4 applies to showerheads only "if they are sold or offered for sale in California."

41. Similarly, the Warren-Alquist Act (§ 25402(c)(1)) limits its prohibition against the sale of appliances that have not been certified compliant to those "sold or offered for sale in [California]."

42. Neither the Warren-Alquist Act nor Article 4 contain any definition of the phrase "sold or offered for sale in California" or any other language purporting to alter the plain meaning of that phrase.

43. Division 2 of California's Uniform Commercial Code, which governs "transactions in goods" such as showerheads (Cal U Com Code § 2102), statutorily establishes where a sale of goods is deemed to have taken place when the goods are shipped to the purchaser using a common carrier (a third-party shipping service), as is the case with Interlink's internet sales. In such instances, Cal U Com Code § 2401(2)(a) provides that the sale is deemed to take place at the location where the goods are provided to the common carrier. It is at that point when, under Section 2401(2)(a), title to the goods passes from the seller to the buyer. Thus, where goods

purchased through the internet are shipped from New Jersey to customers in other states, the sales are deemed to have taken place in New Jersey, where title passes. The same is true under New Jersey law (N.J.S.A. § 12A:2-401(2)(a)) and everywhere else that has adopted the Uniform Commercial Code.

44. The statutory rule that internet sales take place at the location from which goods are shipped is well-established and is controlling with respect to determining the location of a sale. Its validity has been confirmed in multiple contexts by the courts of California, such as with respect to California taxation and warranty statutes, and at least one other regulatory branch of California's government (the California Department of Tax and Fee Administration) has openly acknowledged the rule in its published guidance since at least 2016, as reflected below:

> **Businesses located outside of California**
>
> Internet sales made by out-of-state retailers to California customers are also treated no differently than other remote sales made to California customers. Generally, remote sales by out-of-state retailers to California customers, whether made over the Internet, by telephone, or mail order, take place outside of California because the property is delivered to a common carrier outside the state for shipment into California, and are, therefore, not subject to sales tax. However, California customers do owe the use tax on those sales,

California Publication 109, Internet Sales (2016) (emphasis added).

45. Nothing in the Warren-Alquist Act purports to abrogate or supersede any aspect of California's Uniform Commercial Code or any other state's laws.

46. Nothing in the Warren-Alquist Act indicates that it, or regulations promulgated pursuant to it, were intended to apply to products sold or offered for sale outside of California.

47. The Warren-Alquist Act does not contain any statement that it applies extraterritorially.

48. The Warren-Alquist Act does not contain any statement authorizing regulations that apply to goods sold or offered for sale extraterritorially.

49. Under the statutory provisions of California's Uniform Commercial Code, well-settled California law, and New Jersey law, Interlink neither sells nor offers for sale any of the showerheads at issue in California.

50. Upon receiving the CEC's February 20, 2020 letter, Interlink responded by contacting CEC Investigator Michael Avery by telephone, as instructed by the letter. During the call, Interlink explained its position. Mr. Avery responded that no mistake had been made and that it was the CEC's intent to enforce the regulations against Interlink because the showerheads were supposedly "sold into California" when they were shipped. Mr. Avery was not able to identify any regulatory or statutory language supporting the notion that Article 4 applies to showerheads sold outside of California, but shipped to California, and it was determined that a further discussion involving CEC's counsel would be beneficial.

51. Interlink had multiple subsequent oral and written communications with Mr. Avery and CEC's staff counsel. Despite that Interlink explained and substantiated the legal basis for its position, and that the CEC representatives were entirely unable to identify any language in the Warren-Alquist Act or Article 4 supporting their application of Article 4 to out-of-state internet sales, the CEC representatives confirmed that they were enforcing Article 4 against Interlink and insisted that Interlink comply with their demands.

52. During their communications with Interlink, CEC representatives threatened that they had in the past exploited their authority by contacting internet sales platforms, such as HomeDepot.com and others, and requesting that those platforms remove a seller's products on the

basis that the products violate Article 4. They indicated that they could do the same thing with respect to Interlink.

53. CEC representatives also made clear to Interlink that they intend to demand payment of a civil penalty and require Interlink to conform its products and practices to Article 4.

54. Interlink is now faced with the continued invalid efforts of Defendants, under color of authority of the CEC, to enforce Article 4 extraterritorially against Interlink. Interlink further faces the imminent threat that the CEC will circumvent the judicial process and take self-help action under the color of authority, severely damaging Interlink's New Jersey online business, despite the fact that Article 4 does not apply to Interlink's online showerhead sales.

55. Interlink derives a substantial amount of revenue from online sales. Online sales are driven by product visibility, price and ratings/reviews. With respect to platforms, such as Amazon.com, that rank products and choose which products to display based on factors such as customer ratings and sales popularity, any disruption of or interference with Interlink's sale of a given showerhead is likely to have a significant adverse economic impact on Interlink. Such interference could be long lasting, as it could affect the rankings of Interlink's products and therefore reduce their visibility to customers.

56. There are also numerous other internet retailers whose showerheads with flow rates of 2.5 gpm or much higher can be purchased for shipment to California. Many such retailers are located overseas and do not even comply with U.S. federal showerhead regulations, much less meet the California standards. Interlink sells its showerheads in competition with such internet retailers, who seem to freely ship their showerheads to California without harassment from the CEC. The CEC's efforts to enforce Article 4 against Interlink harm or threaten to harm Interlink's ability to compete with such retailers.

57. The California government has made no effort to establish, on a uniform industry-wide basis, with notice to all market participants, that Article 4 applies to appliances sold or offered for sale outside of California. To the contrary, the language of Article 4, particularly section 1601 governing the scope of that article, tells out-of-state sellers that Article 4 is local in its application and applies only to sales taking place within California.

58. On information and belief, in adopting the standards and enforcement provisions of Article 4, the CEC did not take steps to include out-of-state internet sellers in the regulatory commenting process.

## COUNT I

**(Declaratory/Injunctive Relief—Unconstitutionality Under the Fourteenth Amendment, U.S. Const. amend. XIV, § 1)**

59. Interlink restates and realleges the allegations of paragraphs 1 through 58 as if fully set forth herein.

60. The Fourteenth Amendment provides that "[n]o State shall … deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

61. Defendants' enforcement of Article 4 with respect to sales of products that occur outside of California violates the Due Process Clause because such enforcement is inconsistent with the express provisions of Article IV that establish the scope of those regulations. The targets of Defendants' enforcement efforts are provided no notice under Article 4 of any applicability of the regulations to their out-of-state sales. Rather, the enforcement effort and the scope of enforcement is based on the *ad hoc* determination of Defendants of what they wish to be included in the scope of Article 4 regardless of what it actually says. Defendants, in exercising their enforcement authority, have made the equivalent of legislative decisions extending the statutory and regulatory scope of the Warren-Alquist Act and Article 4 without going through the requisite

legislative and regulatory process and without regard for the inherent unfairness of their actions. Out-of-state internet sellers reviewing Article IV see only that it applies to sales or offers to sell within California, yet are subject to Defendants' unwritten rule to the contrary.

62. In the alternative, if, as Defendants suggest, Section 1601 of Article 4 is susceptible to a reading under which Article 4 covers items sold out-of-state and shipped to California residents, then Article 4 is void for vagueness as to its scope. For the language in Section 1601 to be so broadly interpretable as to both assert that it applies to products only if they are sold or offered for sale in California, yet at the same time support a reading that items shipped to California fall within the scope of the regulations – a necessary predicate to Defendants' position – then it cannot be that it rises above the threshold of being unconstitutionally vague. That is particularly so given the absence of any language in the regulations referring to shipping and the absence of any language in Article 4 purporting to alter the plain meaning of "sold or offered for sale in California."

63. Defendants further violate the Due Process Clause by utilizing the self-help remedy of contacting online sales platforms to request that products be removed under the false premise that they violate Article 4. This self-help remedy circumvents the judicial process and, in this case, would interfere with and damage Interlink's current and prospective business relationships, and deprive Interlink of its right to conduct its business through the targeted online platforms.

## COUNT II

**(Declaratory/Injunctive Relief—Unconstitutionality Under the Commerce Clause, U.S. Const. art. I, § 8, cl. 3)**

64. Interlink restates and realleges the allegations of paragraphs 1 through 63 as if fully set forth herein.

65. The Commerce Clause vests Congress with "Power ... [t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. The dormant aspect of the Commerce Clause prohibits states from unduly burdening interstate commerce.

66. Defendants' extraterritorial enforcement of Article 4 violates the Dormant Commerce Clause by placing an undue burden on interstate commerce.

67. Citing Article 4, Defendants regulate goods sold entirely outside the state of California.

68. Allowing Defendants to continue to engage in their extraterritorial regulatory activities could lead to inconsistent standards and place an undue burden of compliance on out-of-state businesses. If such regulatory conduct is permitted, regulators from all fifty states could impose varying compliance standards (or even worse, as in this case, *ad hoc* standards) pertaining to showerheads that would potentially conflict with each other and which could be nearly impossible to comply with at once. Article 4 contains requirements for the physical properties of showerheads in addition to labeling requirements and compliance certification requirements. Requiring internet sellers to customize product design to accommodate the flow rate restrictions for each of the fifty states, alone, would place an insurmountable burden on them. For example, states would also be free to impose minimum performance standards on showerheads, such as minimum pressure (as the Environmental Protection Agency's WaterSense standards do) and minimum flow rate (*e.g.*, 2.0 gpm). One state's performance requirements could easily render compliance with another state's flow rate restrictions impossible. Accommodating fifty different physical design requirements for a single product is obviously unworkable. The additional burden of labeling the showerheads to satisfy the requirements of fifty states would be exceedingly burdensome and confusing to manufacturers, sellers and customers alike.

69. The extreme undue burden on commerce that would result from allowing all fifty states to simultaneously regulate extraterritorially goes far beyond just showerheads and extends to the broad range of appliances covered by Article 4. Allowing such extraterritorial enforcement would literally create a morass of conflicting regulatory requirements across some of the most widely purchased and needed appliances in every-day life.

70. The burden on interstate commerce of Defendants' extraterritorial enforcement of Article 4 far outweighs any state interest they might assert.

71. Given the express language of Article 4 limiting its scope to goods sold or offered for sale in California, and the absence of California legislative authority for application of Article 4 extraterritorially, Defendant's lack a bona fide basis for their extraterritorial regulatory enforcement activities. Because any interest Defendants' might claim in California's application of Article 4 extraterritorially is not codified and is, in fact, contradicted by the language of Section 1601 and the Warren-Alquist Act, Defendants do not have a valid interest weighing in favor of extraterritorial application of Article IV.

## COUNT III

**(42 U.S.C. § 1983 and 42 U.S.C. § 1988)**

72. Interlink restates and realleges the allegations of paragraphs 1 through 71 as if fully set forth herein.

73. By enforcing and threatening to enforce Article 4, and threatening to pursue self-help remedies, Defendants, acting under color of state law, have violated, threaten to violate, and, unless enjoined by this Court, will continue to violate Interlink's due process rights and its right to engage in interstate commerce free from unconstitutional interference in violation of the dormant Commerce Clause.

74. An actual case or controversy exists because Defendants' various unconstitutional enforcement efforts create a genuine, credible, and immediate threat that Defendants—acting in their official capacities under color of state law—will violate Plaintiff's constitutionally protected rights.

75. Plaintiff accordingly seeks a declaration that Defendants' enforcement related activities would violate 42 U.S.C. § 1983. Plaintiff also seeks reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment in its favor and against Defendants and all persons in active concert or participation with Defendants, granting the following relief:

A. For a declaration, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that Defendants' enforcement of Article 4 with respect to Interlink's internet sales, including any self-help remedies in furtherance of such enforcement, violates the United States Constitution, including but not limited to the Fourteenth Amendment and the dormant Commerce Clause, and is therefore void and unenforceable;

B. A preliminary and permanent injunction prohibiting the actions described herein as constituting the aforementioned constitutional violations;

C. An award of costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

D. Such other and further relief as this Court may deem proper and just.

Dated: June 23, 2020

Respectfully submitted,

The Law Office of
JASON B. LATTIMORE, ESQ. LLC

By  s/ Jason B. Lattimore
    Jason B. Lattimore
    55 Madison Avenue, Suite 400
    Morristown, NJ 07960
    Telephone: (973) 998-7477
    Facsimile:  (973) 264-1159

*Attorney for Plaintiff*
*Interlink International Products, Inc.*

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Pursuant to Local Civil Rule 11.2, I hereby certify under penalty of perjury that, to the best of my knowledge, the matter in controversy is not the subject of any other action pending in any other court or of any pending arbitration or administration proceeding.

Dated:  June 23, 2020

s/ Jason B. Lattimore
Jason B. Lattimore